### THE W. H. GRATWICK.

#### SCHEELE v. THE W. H. GRATWICK.

(District Court, N. D. Illinois. June 1, 1897.)

COLLISION—MUTUAL FAULT—TOW AND SAIL—FOG.
    A schooner collided in Lake Michigan, during a fog, with a barge towed by a steamer. The barge did not ring a bell so as to be heard on the other vessels, and the schooner might have avoided the collision by porting her helm after hearing the steamer's whistle. *Held*, that the damages should be divided between the barge and the schooner, both being to blame.

Libel by Henry Scheele, Jr., against the steamer W. H. Gratwick, and Barge 133, to recover damages resulting from a collision.

Schuyler & Kremer, for libelant.
Goulder & Holding, for claimants.
Hoyt, Dustin & Kelley, for Barge 133.

GROSSCUP, District Judge (orally). The libel is to recover damages growing out of a collision between the schooner Sunrise and Barge 133, in tow of the steamer Gratwick, occurring in the middle of Lake Michigan, nearly opposite the city of Racine, on the morning of May 21, 1896. The Sunrise, a three-masted schooner, was bound to the Straits of Mackinaw, and at the time of the collision was taking a course N. N. W., carrying all her lower sails. The wind was S. S. W., and of sufficient force to drive the Sunrise at from four to five miles per hour. The barge was of the whale-back pattern, without engines for locomotion, and was bound to South Chicago in tow of the steamer Gratwick. The weather was foggy, a fog having set in during the night preceding. The course of the schooner

at the time of the collision was such that it crossed that of the steamer and its tow at an angle of from 3 to 3½ points. The schooner struck the tow line about 75 feet in advance of the barge, and was struck, in turn, on her starboard bow, by the nose of the barge; the stroke being hard enough to carry away the schooner's bow and cause her, within a short time, to sink. The evidence satisfies me that the steamer, before and at the time of the collision, was blowing regularly, at intervals of about one minute, her fog whistle. I am not at liberty to believe from the evidence that the schooner failed to blow her horn. The evidence of the crew all concurs to that effect, and the crew on the steamer and the barge heard at about that time fog signals, which they now say belonged to a schooner that passed them and went astern. The crew on the barge all testify that the bell was rung, each stroke following immediately after the dying out of the steamer's whistle, and that this occurred up to the moment of the collision. None of the three vessels were ever in sight of each other, although the tow line was only 900 feet long, until the barge and the schooner were immediately upon each other. It is singular that the steamer's whistle was not heard earlier by those on the schooner, though the wind being from the south would have a tendency to retard its transmission, and equally singular that the schooner's fog horn was not heard earlier by the steamer, for the wind was in its favor. But a great deal of allowance must be made for the bias of the witnesses in respect to these details, each crew doubtless thinking that an earlier apprehension of the other's signals would be detrimental to the cause of their vessel. There may have been atmospheric conditions at that time and place that interfered with the transmission of sound, but my best belief is that the respective crews, or those on the lookout, heard these signals earlier, and when they were still further apart, than the testimony now indicates.

Taking this for granted, there is no phase of the situation that required the steamer to turn from her course. She was running as slowly as the rules required, and she had no reason to know that the course of the schooner would cross her course. Had she known that, I know of nothing she could have done, except to stop, and that would have exposed her, and the schooner as well, to as much danger as a continuance of her course. I dismiss, therefore, the steamer from all fault.

The only maneuver that would, under all the circumstances, have avoided the collision, was a change in the course of the schooner from N. N. W. to a more northerly course, by putting her helm hard a-port. This maneuver would have been impressed upon her as an urgent necessity if, after having heard the steamer's whistle at a short distance on her port beam, she had heard also a bell on the barge in the steamer's wake. She would then have fully realized that the steamer had a barge in tow, and that she was crossing their line in dangerous proximity to the barge. The failure of the schooner to hear the bell, therefore, is a potent element in the causes leading to the collision. While the crew on the barge testify to having rung the bell, it was heard neither on the schooner nor the steamer. This

latter fact, coming as it does from a disinterested source, is of controlling importance. The bell was hung on the forward turret, immediately behind it, and near its top, and was 15 inches across the mouth and 12 inches deep. It is said to have been hung at the usual place for bells on such vessels. The object of the regulation requiring a bell on a barge to be rung is that it should be heard. This bell was not heard on the steamer for six or seven hours preceding the collision, and either it was not rung, or else it was, by reason of its location or its quality, inefficient for the purposes of a signal, or else the atmospheric conditions then prevailing were so abnormal as to interfere with the successful working of an efficient bell. While there are in the books well-authenticated instances of atmospheric area impervious to sound, none have been called to my attention that covered more than a few miles in distance, or a little while in time. The abnormal character of the condition relied upon by the barge here must have extended over a space from 20 to 40 miles in length, and through a time covering 7 hours, for the bell had not been heard on board the steamer since a quarter before 1 of the afternoon preceding the collision. Such abnormal atmospheric condition, both as to space and time, may not be impossible; but, it is certainly among the high improbabilities, and I do not feel justified in admitting it as one of the facts in this case. I hold, therefore, the barge to have been at fault, either in not having had an efficient bell, or in having failed to ring it at and preceding the collision.

But the schooner herself was not without fault. Her course when she heard the steamer on her starboard beam was N. N. W.,—a course that in ordinary practice lay directly across the usual course of steamers going down the Lakes. She ought, in the exercise of high prudence, to have realized this fact, as well as its consequences in bringing her dangerously close to anything that might be in tow of the unseen steamer, and have accordingly ported her helm, thus turning her course to the northeastward; for she knew that the steamer was south-bound, and to her port side. She could not by this maneuver have injured her situation, and, on the contrary, stood many more than a majority of chances of improving it. For failing to do this, I hold her guilty of a fault. In consequence of these holdings, the damages will be divided between the barge and the schooner.